LUIS ANTONIO MIRANDA, Plaintiff and Appellant, *v.* EDITORIAL EL IMPARCIAL, INC., and IRIS MIERES AYUSO, ETC., ET AL., Defendants and Appellees.

No. R-69-281.  Decided February 8, 1971.

584

*Héctor González Blanes* for appellant. *Benjamín Ortiz* and *Adolfo Mieres Calimano* for appellees.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

We are dealing with an action for the recovery of money and damages for breach of contract. The Editorial El Imparcial, Inc., retained the professional services of journalist, Luis Antonio Miranda, through contract of July 26, 1967, signed on behalf of the Editorial El Imparcial, by Antonio Ayuso Valdivieso, as President and Director.

On June 24, 1968, a letter signed "Iris Mieres Ayuso, Secretary," was addressed to Miranda, informing him that she had decided to terminate his services to said enterprise, beginning on that same date.

The foregoing events gave rise to the present action filed by Miranda, plaintiff-appellant, against the Editorial El Imparcial, Inc., Iris Mieres Ayuso, by herself and assisted by her husband, Antonio Ayuso Valdivieso and their conjugal partnership, and Clement Littauer, as defendants-appellees herein.

The existence of the contract of professional services between the Editorial El Imparcial and Luis Antonio Miranda, by virtue of the contract of July 26, 1967, was accepted by each and every one of the defendants, who answered the complaint separately.

The trial having been heard on its merits, the trial court rendered its judgment on September 29, 1969, dismissing the complaint. Upon dismissing the complaint, the trial court made the following:

*"Findings of Fact*

"1.—Editorial El Imparcial, Inc., is a corporation duly authorized to do business in Puerto Rico. It publishes daily, in San Juan, the newspaper known as 'El Imparcial.'

"2.—Plaintiff, Luis Antonio Miranda, is a well-known writer, whose literary merits have been widely acknowledged in the intellectual circles of Puerto Rico, and whose prestige goes beyond the geographical limits of our island. He is an experienced journalist. During all his long life he has been connected, in one way or other, with journalism.

"3.—In 1967, the corporation Editorial El Imparcial, Inc., had great financial difficulties. The circulation of the newspaper it published had dropped considerably. In an effort to avoid the expected financial failure, representatives of the corporation approached Luis Antonio Miranda and offered him the direction of the newspaper 'El Imparcial.'

"4.—There were a series of meetings and consultations in regard to the position Luis Antonio Miranda was going to occupy in the newspaper 'El Imparcial.' Finally, on July 26, 1967, a contract of services was executed, wherein there appeared Antonio Ayuso Valdivieso, for the defendant corporation, and plaintiff himself.

"5.—According to the contract which we have mentioned above, plaintiff was appointed Assistant Director of the newspaper and a so-called Editorial Board was created which, according to the contract, would be composed by its Director, its Executive Vice-President, the Secretary of the corporation, and Luis Antonio Miranda himself, in his capacity as Assistant Director of the newspaper. It was incumbent upon that Editorial Board to determine the newspaper's policy and editorial standards.[1]

"6.—At this time, Attorney Antonio Ayuso Valdivieso was Director of the newspaper and owner of all the shares of the corporation. During the course of the trial it comes forth that he was sick and it is implied that he was mentally sick. However, none of the parties made any real effort to show that Ayuso Valdivieso was already disabled by that time. But, an order of November 1, 1968, of the Superior Court, Caguas Part,

---

[1] Despite this finding in the sense that it was incumbent upon that Editorial Board to determine the newspaper's policy and editorial standards, the trial court itself concluded, in additional findings of fact, that while Miranda occupied the position there was no Editorial Board. In its fourth additional finding of fact the trial court stated: "That neither did the Board of Directors, nor the Board of Stockholders of the Editorial El Imparcial, Inc., meet while plaintiff occupied his position, nor, according to the minutes of the corporation, is there an agreement for the creation of the aforementioned Editorial Board, in which Iris Mieres Ayuso is interested, the only reference to said Editorial Board being contained in the letter-contract of July 26, 1967, mentioned by the court in its foregoing findings."

stating that Ayuso was mentally disabled, was presented in evidence.[2]

"7.—During the time Luis Antonio Miranda acted as Director of the newspaper 'El Imparcial,' in Ayuso's absence, there was an increase in the circulation of the newspaper and in the sale of space for advertisements. However, the corporation's financial situation remained desperate. As a matter of fact, Miranda did not intervene in the administrative aspect and he did not know whether there were losses or profits in the newspaper's publication, and he did not even know what his department's budget was.

"8.—The Editorial Board of a newspaper is the one really in charge of the direction of the same. The director is the executive officer of the Editorial Board. When Luis Antonio Miranda took office as director of the newspaper, this Board never met. The same was called for the first time when codefendant Clement Littauer started to work for the defendant.

"9.—Since the financial situation of the newspaper 'El Imparcial' was still chaotic, on June 1, 1968, Antonio Ayuso Valdivieso appointed Clement Littauer as Executive Vice-President and Chief Executive Officer of the enterprise.

"10.—Since before the appointment of Littauer, there were frictions between Luis Antonio Miranda and Iris Mieres Ayuso. The difficulties arose from the fact that, occasionally, Iris Mieres Ayuso made assignments to the newspaper editors, and Miranda understood that that was an improper meddling of the former with his functions and prerogatives as Assistant Director and Acting Director of the newspaper.

"11.—After Littauer's appointment, the difficulties increased. Littauer informed Luis Antonio Miranda that according to an investigation performed by him, the newspaper had a pro-independence and communist image and that that prejudiced the sale of the advertisements of the newspaper. They also had differences as to the selection of the front page news.

"12.—On June 12, 1968, a meeting of the Editorial Board was called. Luis Antonio Miranda was not present at that meeting. Apparently, because he thought that it was not going to be held. If he had been present, he would have circumscribed himself to challenge the legality of said Editorial Board. He

---

2 See *Colón* v. *Superior Court*, 97 P.R.R. 103 (1969).

understood that said Board could not be legally constituted, and that in any event, it did not have any authority whatsoever over his work as Assistant Director and Acting Director of the newspaper.

"13.—Luis Antonio Miranda wrote two long letters to Iris Mieres Ayuso. One was dated June 10, and the other, June 19, both of 1968.[3] The court concludes, as a matter of fact, that the same are offensive and disrespectful, considering their positions in the enterprise.

"14.—As a result of the above-mentioned letters, on June 25, 1968, Attorney Antonio Ayuso Valdivieso discharged Luis Antonio Miranda from his employment and salary."

---

[3] The text of each one of the letters is as follows:

"June 10, 1968

"Mrs. Iris Mieres Ayuso
Luchetti Avenue, Condado
San Juan, Puerto Rico

"Dear friend:

"Since with regard to Antonio's health condition you have decided to act in his name, introducing changes which prove to be contrary to the latter's ideas, impairing at the same time the EL IMPARCIAL enterprises, and breaching the contract through which I was led to abandon my previous activities in order to take charge of the direction of the newspaper, I have decided, as promised, to address these lines to you, fearful of the disaster I feel coming, as well as of the serious disturbance caused to the work which—against the created inconveniences—I have been performing. Besides the warning, perhaps still on time to correct the wrongs of, and to legalize the administration, the purpose which I seek with this letter is: (1) to save my position as director from such acts; (2) to state formally my nonacceptance of the alteration or violation of the conditions under which I accepted to devote my efforts to straighten the operations of the enterprise, and bring it to the level of high journalism and improvement in which I found the same before your intervention (which is only justified, in your opinion, by Antonio's sickness and disability, and which have been aggravated for several months).

"Iris, my friend, I need not emphasize the great displeasure I feel by having to make these statements which, upon their direct relevance concerning the interest in my work—and to assert my contractual rights—provoke disputes and contentions—to be decided—sensitive as they are, considering the deep-felt affection which I profess for Antonio, who, naturally, by the way, cannot be made responsible in any manner whatsoever for what is happening, nor of the gross errors committed and which, even regretting it, I would like to temporize, in due deference to you, were it

not for the serious prejudice I point out and a complicity which I cannot admit by any means.

"I will try to be more specific:

"In the first conversations I had with Clement Littauer, I anticipated (and I informed you so), that if the latter was appointed Executive Vice-President, as you were interested in doing (because you thought that that would be or was Antonio's desire), said gentleman would seek to exercise powers in conflict with the powers proper of my office and with what was preagreed when I assumed the newspaper's direction. I was, thus, in disagreement with his ideas (including the one which referred to the creation of a Board, presided by him to control the Editorial Staff, and to impart the modalities he had in mind to EL IMPARCIAL). I demanded, therefore, that if he were admitted, he should not interfere with the fulfillment of my duties, nor with the established functions on which my contract basically relies.

"You will remember that when you took part in the matter, as spokesman for Antonio, you agreed that, in effect, I was right and that the aforementioned appointment, if it was to take place, would not alter the policy I established, and that it would not intervene with my office, nor with the personnel under my supervision, and that I would maintain the enjoyment of the independence which I claimed from the beginning and which was granted to that respect. The appointment was made under such conditions, despite my conviction to the effect that, if Antonio could have expressed an opinion, it would not have been made.

"As I assumed, since the beginning of the same, Littauer adopted powers which he alleged were granted by Antonio—thing which as you know, is impossible—and which are fully in conflict with those which I have been exercising by virtue of the understanding under which I assumed the real and unembarrassed direction of EL IMPARCIAL, about the middle of the past year.

"As you know, I did not apply for the position I hold. Antonio went to my house to offer it personally and voluntarily, claiming that 'he needed me to rescue the newspaper, which had been stolen from him during his sickness.' Such were his exact words.

"In view of his insistence and of our long-standing friendship, I accepted to leave my column 'Observatorio Boricua,' published daily in EL MUNDO, and I agreed to return to Antonio's side, collaborating with him once more with the same spontaneity as I have done in numberless occasions in the past. His express petition and my commitment were to return to EL IMPARCIAL its characteristics of an independent and Puerto Rican press, encouraged by the ideals which stirred up his struggles in the public environment.

"Because of my close friendship towards Antonio, and because of the deep feelings of my conscience, I decided to share with him the direction of EL IMPARCIAL, *with no other bosses*. And when in discussing my contract in the office of attorney Félix Ochoteco—you, Antonio, Guillermo Cintrón Ayuso, and myself being present there—and proposing that I was to hold the position of Director of the newspaper, I demanded that

Antonio should appear as Director and I as Assistant Director, at least in view of letting him be the symbol of his own enterprise. At that time Antonio argued that actually, I would be the Director; but I insisted that he was the one to appear as such, even though, nominally, to which we all agreed.

"Both requirements—to return to the newspaper its independence of views, its Puerto Rican physiognomy, as well as my position as his representative (Antonio's) in such purposes—were the main causes or considerations which led me to accept Antonio's commission, because they were in accord with my convictions, principles, and spiritual longings.

"As it is evidently clear, the new executive vice-president grafted an unexpected and irreconcilable distortion to the commission I received from Antonio and for which I accepted to sacrifice my efforts, with great threat and prejudice to the constructive zealousness of my strife to perform my work with a pleasing acknowledgment to journalism.

"The income by way of advertisements, the circulation, and the favorable repercussions which EL IMPARCIAL recovered in the public opinion during the eleven months I have been directing the newspaper, show the results offered to the enterprise by the Editorial Staff with its team efforts and leadership. Another matter to be highlighted is the one to the effect that EL IMPARCIAL covered and is surpassing this year the $400,000 it failed to accrue by way of advertisements—despite those obtained during the plebiscitary campaign at that time—precisely when it sustained the misfortune of having been stripped of its own personality.

"According to the motivations which led me to accept the direction of EL IMPARCIAL—as a true fact—I cannot accept, as it is sought to be imposed upon me by surprise, another authority other than Antonio's. I cannot admit, over the powers with which I was invested, any antagonistic outlook towards the Puerto Rican ideals defended by the newspaper, to which the above-mentioned executive vice-president has attributed with gratuitous damage 'a communist and nationalist image.'

"It is evident that my responsibilities as director of the editorial policy, which have returned its own character to the newspaper, must reject any hostile intervention which alters: (1) the newspaper's respectable history; (2) the convictions and ideologies which I came to defend and preserve because they are my own, and (3) the motivation which induced me to agree with Antonio in returning to the newspaper the attributes which were his principles and objectives during all his life.

"The interventions tending to damage the principles which were the basic cause of my contract go so far as having Littauer suppressed, without my authorization or opinion, an editorial page, several columns of regular collaboration, two pages from the social section, two pages from the sports section, and several other sections, without even taking into consideration the discredit such suppressions could cast upon the newspaper and the damage to the circulation of the same.

"Requesting your cooperation to prevent the prejudice which the present conflict causes to the newspaper, as well as to myself, as a result of the above-mentioned violations, as well as of the action I shall be obliged to

take in order to clarify my position, yours, and Littauer's in this annoying affair, I remain, as always, cordially yours,

LUIS ANTONIO MIRANDA".

.        .        .        .        .        .        .        .

"June 19, 1968

"Mrs. Iris Mieres Ayuso
Secretary, Board of Directors
Editorial EL IMPARCIAL, INC.,
San Juan, Puerto Rico 00902

"My dear lady:

"In my letter of Monday (June 10), I urged you to stop impairing my official duties in EL IMPARCIAL, setting forth the violations committed, violations which endanger the destiny of the enterprise itself, and which nullify the effects of my efforts seeking to improve the same.

"In discussing with me the concepts of my letter, you agreed with the seriousness of its motivations and with the justification of my complaints, and you managed to leave me with the refreshing impression that you were to rectify your conduct, and that, therefore, 'you would overlook' said letter.

"Being aware of the fact that that was no solution, and fearing that in your hasty appraisal you neglected the important requirement of not disturbing or to stop obstructing my work, or interfering with the persons under my supervision, I admonished you again to that respect, warning you of my firm decision to maintain everything I set forth in my letter, for I considered I had surpassed the limits of all possible tolerance. I specified the damages which have been caused by Clement Littauer, who is mainly interested in speculating—because such is his basic activity— with the property of the enterprises; and not certainly, in the latter's life and prosperous and definite development. His entrance into the editorial staff had to be fundamentally in conflict with my projects and with my commission, which are very different from his, which do not coincide either with the objectives contemplated by my appointment. The attention given to a business which is to be sold is different from that given to a business which is to be developed and enlarged. Littauer is interested in the potential buyer, the realtor's financing, the commissions, the closing charges, the promotion, the 'good business,' and the climate of financial activity which brought him to Puerto Rico some years ago. I am interested in the dynamism of the enterprise, in the reader, in the circulation of the newspaper, the quality of the same, the tranquillity and well-being of the cooperating personnel, the preoccupations of my country and its destiny, the value of academicism, of knowledge and the ideas. I was born here and I live here, where I expect to die, in the execution of the work which has given humble support to my family and to myself. We are two opposite poles. I would never have accepted the direction of EL IM-

PARCIAL, along with a person with ideas such as his. Neither would Antonio, if such were his choice. And you know that.

"You and Littauer are interested in the sale and liquidation of EL IMPARCIAL, and that keeps the enterprise and its numerous employees in a state of indecision, anxiety, and demoralizing uncertainty.

"It was *the Enterprise*—not you—who brought me here in order to rehabilitate it and to place it in a position where it could attain the purposes for which it was established, under a contract whose effectiveness does not depend, *nor can it ever depend*, on any of you. My work, my aspirations for the benefit of the newspaper, and my devotion, constitute an annoyance and lack importance for both of you. Neither you, nor Littauer, are interested in this. According to this gentleman's thesis, the newspaper does not need informative pages, and paper should be used more sparingly. Only advertisements to support itself provisionally—until the sale takes place—like a billboard. (People place advertisements and read the news in the newspapers which sell well. A newspaper full of advertisements is not sold.) Nobody has doubts as to the reason why you brought Littauer to EL IMPARCIAL, and if there had been any doubts, he has undertaken to dissipate them with his sales promoting trips. It is about time these truths are understood, OR EL IMPARCIAL SHALL NOT EXIST ANY MORE as a news medium, a vehicle of expression, and an object of satisfaction and pride for our country. Neither you, nor Littauer, shall become aware because it does not fall within your projects the fact that EL IMPARCIAL is at the service of our community for higher purposes than to publish classified sections and advertisements (in which only a small minority of the people is interested). We cannot ponder sufficiently the seriousness and great importance of this whole picture. I shall only refer to some of its consequences:

"During the course of this month, your conduct as well as that of your personal advisor, have caused our organ of publicity, which used to be one of the highest rating in the island, to be disfigured to miserable editions which scarcely compete with EL DÍA—a very important number of pages of general information, of collaborating columns, and of social and sports aspects, of great public stability and demand, have been suppressed. This last action, besides failing to honestly fulfill the expectations of the people who buy *and pay* for an informative newspaper, is of such damaging nature that it almost gives rise to the suspicion that it is the product of a deliberate plan directed to bring about its own discredit. Not only is Antonio's spiritual image completely eliminated (image which I strove to preserve, because he is the owner and is still alive) to the vexing point of substituting his name for that of Clement Littauer in the heading of the BOARD OF DIRECTORS—sadly relegating Antonio's name to the bottom of the list, with the title of President, which with the change seems an ironic jest—but marked efforts are taken to destroy the work to which he consecrated many years of grief and devotion. The protection of that work was the most essential cause of the contract I signed and the reason why Attorney Félix Ochoteco—who suggested my appointment and urged me to accept it—and the then Acting President, Mr. Guillermo Cintrón Ayuso, retained my services for the term of 6 years.

"Last Wednesday (June 12, 1968), I received a notice for a meeting which you sent—As Secretary of the BOARD OF DIRECTORS—convoking to a so-called meeting of the NEVER CONSTITUTED 'EDITORIAL BOARD OF EL IMPARCIAL,' where, according to its contents, Messrs. ANTONIO AYUSO VALDIVIESO, you, Littauer, and myself, were to be present. Besides, as I learned afterwards, you also invited José Luis Núñez and Santiago Gálvez Maturana.

"I HAD DECIDED TO GO TO THAT MEETING in order to challenge its legality, for the same reasons which were once set forth by Attorney Félix Ochoteco—and with which you were acquainted—to set forth in the MINUTES thereof (if, as Secretary, you happened to draw up any), the position I had assumed in the letter I sent you on the 10th (copy of which I enclose herein in order to avoid repetitions and ambiguities). Sua sponte, you had set the holding of this meeting for 4 p.m. of the following day (that is, Thursday, June 13, 1968).

"Sometime before the hour indicated, you came all upset to my office to discuss my position and what I was going to say in that meeting. You stated your wish to the effect that I was not to mention what I had set forth in writing 'to avoid arousing Antonio against Littauer.' In view of my strong refusal and because I could not consent to your petition, you angrily informed me that the meeting would not be held, but that you wanted to let me know that you would follow Littauer's advice, which I, of course, acknowledge to be your personal right, provided, however, that it does not intervene with, or defeat the rights which I, in turn, derive from my contract and from my position in the enterprise.

"To my surprise, I learned afterwards that that day, despite what you had told me, you proceeded to hold the meeting, behind my back, and that therein you made false statements, such as saying that I had asked you to excuse me, and stating or giving the impression that I agreed with everything you and Littauer proposed. All that in the presence of Antonio, who, at all times, despite his disability, appears friendly and animated in my presence and displeased at Littauer. It seems that you and Littauer in acting thus 'not to arouse Antonio,' in the irresponsibility of that act, lost sight of the fact that you were attributing to me an action which fortunately, is strongly denied in the letter which I sent you and which you received days before—that is, the letter of the 10th—which I eagerly attach hereto. You should have thought that your conduct, whether or not advised by somebody else, was improper and that it would only arouse indignation, as subterfuge usually does. Antonio is so detached from this picture and exempt from all fault in this affair, as was his sad relegation in the aforementioned informative plate. Then, in addition to the many hours of work and to the repeated complications caused by the derangement brought to the newspaper, you bring about upon me the additional sacrifice of having to take some hours from a well-deserved rest in order to write these pages seeking to prevent new intrigues and troubles which are the cause of so much disgust and disappointment.

"However, girding myself with a great patience, I am compelled to inform you of my natural protest, of my feelings and convictions in con-

nection with the aforementioned meeting, requesting likewise, as Director, that besides including this letter as part of the minutes of that meeting which you have prepared or intend to prepare, to keep the carbon copy which I also enclose, for reference in the official files of the corporation. Both documents, as well as the annex, consisting of a copy of my letter of the 10th, are sent by certified mail, return receipt requested. I also send a copy to all those who were present at that act, except, of course, to Antonio, whose confused mind is far from understanding what is going on.

"Then, here are my remarks on the character of, and on what was dealt with—as I was informed—in that meeting:

"1.—In the first place, the friendship and affection I have always felt for Antonio, force me to reject the manner in which his disability and condition have been taken advantage of, in order to usurp the authority incumbent upon the presidency. You, better than anyone else, know that if Antonio were qualified, Littauer would not have stayed for a second with the newspaper. In any event, and even though such was not the case, it is very sad to see Antonio continually exposed to situations which, because of his failure to understand them and because of his deplorable mental condition and the aggravation of his nerves, frequently lead him from a state of submission and serenity to incoherent explosions, which should be avoided at least for his own sake. Those are scenes which, sadly, when they arise, only emphasize the humbug which is sought to be concealed.

"2. When I was offered the commission of Director, which Mr. Guillermo Cintrón Ayuso offered me, following Attorney Ochoteco's advice, and which I finally accepted at their request and to Antonio's great happiness, I demanded the formal ratification and clarification of the contract by the Executive President in office, Mr. Guillermo Cintrón Ayuso—which I had also demanded from him at a previous meeting held at the former's law office (where you and Antonio were present, as well as the two of them)— it being the cause and condition of the contract—of which you are aware—to prevent precisely the acts which you have been performing more diligently than ever, after Attorney Ochoteco's death. Cintrón Ayuso, who because of Antonio's disability took charge of the presidency, and you, yourself, recognized my appointment and powers as director, and to act *without the intervention* of any other person or boss, and maintaining—because such is my desire—the symbol which he is for the newspaper he established—and for the ideals he defended—to keep him at least, nominally, as the director which he always was, deep at heart—because, otherwise, it would have been impossible. To myself, because of the loyalty which my principles and convictions deserve—part also of the human being and happiness—my demand was not a mere sentimental impulse, but an unquestionable way of preventing changes during my time in office, which would be in conflict with my ideals, well-known to everybody for many years, as Director and Editor. My determination in this respect was known, and I made it clear that it could not be changed during the term of my contract, and that nobody would interfere with me, nor with the personnel under my supervision. It was thus clearly understood that, at least for the term of six years,

the position of Director belonged to me and I would discharge the duties of such position as I did. Under such conditions, I repeat, I would work, without a boss, having the command and control of the employees assigned to the Director, and without the Administration or any other person changing the newspaper's character and personality.

"3.—It was also my purpose to set forth at that meeting, as I do now, my protest against Littauer's appointment and unlawful intervention. To avoid having conflicts with you and with the then clear understanding in the sense that this particular advisor of yours would by no means disturb my work and functions, I refrained from asserting my protest against the illegality ab initio of the appointment which you did without authority, and to which you tried to add the nonexistent and fabricated title of CHIEF EXECUTIVE OFFICER, since upon Cintrón Ayuso's retirement the ADMINISTRATION would remain in an acephalous condition. Everything was directed to make my stay in EL IMPARCIAL as annoying and disagreeable as possible, and to make it easy for you to start operations, as you are doing, as if you were already the owner of the enterprise, controlling, between you and Littauer, the enterprise and the duties of the employees.

"4.—By these means you would try to do what is legally impossible to both of you—without first declaring Antonio incompetent, with the legal protection, in such case, of all those interested, and with the proper judicial intervention which would protect, above all else, the disabled's interests. In connection with this aspect, I want to stress the fact that when I refused to cooperate in giving a false impression as to Littauer's claimed authority, the two of you had the alleged appointment of the so-called 'CHIEF EXECUTIVE OFFICER' broadly displayed in other news media, together with an eulogistic note specially prepared by yourself and which you attributed to Antonio.

"5.—Finally, I must challenge the legality of the aforementioned EDITORIAL BOARD OF EL IMPARCIAL, which was *never* established by the Executive Vice-President, Mr. Guillermo Cintrón Ayuso, nor can it be legally established because of Antonio's disability. As advised by Attorney Ochoteco, the establishment or framing of that Board should not be attempted as long as Antonio's condition prevails, it should be deferred or postponed until the grounds for that objection disappear, or until Antonio is declared legally incompetent. It is unnecessary to consider that if said EDITORIAL BOARD is legally impossible, then less possible is the creation, by such Board, of an assistant board or committee. In addition, I repeat, Littauer's appointment being illegal, and considering the distortion of the corporate structure of EL IMPARCIAL, it is impossible to conceive that between the three of you, Littauer, Antonio—who is disabled—and you, a Board can be established in order to 'choose editorial themes, informations, photographs, headings, etc.,' and damage and mar in such derisory and absurd manner my duties as Director, for the purpose perhaps, of promoting my resignation through force and harassment, and to destroy the performance of my duties on behalf of the health of EL IMPARCIAL. Perhaps you are not aware of *the reason* why Messrs. Ochoteco and Guillermo Cintrón Ayuso urged me to undertake the commitment I did, and which I feel bound to defend as a

question of law and of my conscience. There are many things of which you lose sight in your task seeking liquidation and spectacular profit.

"Therefore, since all the acts which I mention above are illegal and harmful to my rights and duties, I have decided to bring the pertinent judicial action. For that purpose I shall retain the services of Attorney Héctor González Blanes. I choose him for two reasons: 1st—Because Attorney Félix Ochoteco, long-time attorney for EL IMPARCIAL, and who had direct knowledge of my position when I was appointed, at his proposal, and upon learning of the functional disarrangement due to your intervention, he felt under the obligation of protecting me, and being foresighted as he was, he referred me to said attorney, when I learned shortly after my appointment, of the steps that were being taken to sell the enterprises; and 2d—because on account of the uninterested legal assistance which Attorney González Blanes agreed to give to Antonio Ayuso on the crucial moments of his life, and because of the good friendship which has always brought them together, he shall be able to judge my position with greater deference to you—as it has always been my desire—and to make as little annoying as possible the hearing in court of these differences and of the damage which your actions and the situation created within EL IMPARCIAL, have caused unto me.

"It is not necessary to emphasize that I take this step because it is the only choice you and Littauer left me and because your latest actions make it evident that your purpose is to close all my roads and suppress my rights to the point of provoking the wretched time, annoyance, and expenses of a litigation which, in view of the grateful acknowledgment—which still rings in my ears—and in view of my work in marked benefit for the newspaper, is not conceivable.

Sincerely,<br>(Sgd.) LUIS ANTONIO MIRANDA

"Carbon copies of this
letter and of letter 6/10/68.

"P.S. When I was ready to send the foregoing letter, I received your phone call asking me to go to your house. I thought it was convenient to consult Attorney González Blanes, whom I asked to go with me, which he did, after calling you and requesting your consent. In that interview which was held while Antonio was lying down in an armchair, two facts were established, as usual: That Antonio, who only answers to emotions and to memories of his friends, also showed anger every time we mentioned Littauer and he cheered up whenever my need to remain as Editor was emphasized, and second, that in view of his condition and your words, it was evident that you are the one who wants to speak up and that his desires or wishes are of no avail.

"Attorney González Blanes, with whom I spoke later on, agreed with me that Antonio answers only to memories of our sincere friendship, to sometimes placid and other times evident emotions whenever I am barred out, but that he cannot analyze any transaction, feeling highly alarmed and in disagreement. Since I am convinced by your reiterated attitude that you

On the basis of those findings of fact, the trial court made the following:

*"Conclusions of Law*

"I.—Section 25 of the Law of Evidence is applicable to the facts of this case.

"II.—It is assumed that the written contract executed between the parties on July 26, 1967, comprises the parties' real intention and the conversations held between the parties prior to its execution cannot be taken into consideration.

"III.—Luis Antonio Miranda's refusal to acknowledge the authority of the Editorial Board of the newspaper 'El Imparcial' is equal to a breach of contract on his part. His conduct is equivalent to an insubordinate and disobedient attitude towards the rules established in the contract itself, and they justify the termination of the contract by the employer.

"IV.—The letters addressed to Iris Mieres Ayuso, considering the charges made against her therein, justify also the termination of the contract for services.

"V.—The conduct observed by Clement Littauer and by Iris Mieres Ayuso, in view of all the circumstances, cannot be considered as a conduct directed to cause damage to plaintiff, but rather as honest differences of opinion as to the manner of operating a business."

Subsequently, on October 2, 1969, at the request of plaintiff Miranda, the trial court made the following:

---

are seeking my prejudice and to carry out your plans with Littauer (which are not, certainly, to save the enterprise), it being so notwithstanding your efforts trying to establish a different impression at meetings which basically lack practical objectives, I reaffirm, with greater conviction what I stated before.

"Copies are sent to the following persons by registered mail:

"1.—Mr. Clement Littauer—Editorial El Imparcial, Inc., Box 2792, San Juan, P.R. 00903.

"2.—Mr. Santiago Gálvez Maturana—Editorial El Imparcial, Inc., Box 2792, San Juan, P.R. 00903.

"3.—José Luis Núñez—Editorial El Imparcial, Inc., Box 2792, San Juan, P.R. 00903."

### "Additional Findings of Fact

"1.—That since late in 1960 and until February 27, 1964, plaintiff had worked for El Imparcial as Assistant Director, position which he resigned because of the interventions of Armando Cosme, then Manager, as well as because of the differences existing between Miranda and said gentleman who, subsequently, in turn, ceased as such Manager.

"2.—That in requesting plaintiff's services again, in order to have him accept the position of Director of the newspaper El Imparcial, in July 1967 a meeting was held at the office of Attorney Félix Ochoteco, Jr., where, besides said attorney, the following persons were present: Messrs. Guillermo Cintrón Ayuso, Mr. and Mrs. Ayuso Valdivieso, and plaintiff, it being agreed in that meeting that the Editorial Board, the constitution of which was suggested therein by Mrs. Ayuso, was not going to be established on account of Mr. Antonio Ayuso Valdivieso's disability, and also, that in order to prevent the repetition of the acts which had forced Luis Antonio Miranda's previous resignation, Mrs. Ayuso, specifically, nor any director in particular, would intervene with plaintiff in the fulfillment of his duties as director.

"3.—That after said meeting was held on July 24, 1967, right after a meeting with the President of the corporation, Mr. Héctor Cintrón Ayuso, plaintiff took office and began to fulfill his duties under the title of Assistant-Director.

"4.—That while plaintiff was in office, neither the Board of Directors, nor the Board of Stockholders of the Editorial El Imparcial, Inc., met, nor is there any agreement, according to the minutes of the corporation, establishing the creation of said Editorial Board sought by Iris Mieres Ayuso, the only reference to said Editorial Board being contained in the Letter-Contract of July 26, 1967, to which the court referred in its previous findings.

"5.—That during plaintiff's first three months in office, Mrs. Ayuso did not intervene with him nor with the former's duties; but after the aforementioned three months she started to intervene with the editors under plaintiff's supervision and with his duties as director, thereby giving rise to plaintiff's protest against such intervention before her, as well as before

the Executive Vice-President, Mr. Guillermo Cintrón Ayuso, and the President, Mr. Héctor Cintrón Ayuso.

"6.—That defendant justified her interventions on the grounds that she was Mr. Ayuso's wife and, therefore, she was also the owner of the enterprise, and also in her capacity as secretary.

"7.—That Iris Mieres Ayuso had an active intervention in bringing Littauer to El Imparcial, by having written with her own hand the documents concerning Littauer's appointment, and she likewise had an effective intervention in plaintiff's discharge.

"8.—That after plaintiff was removed from his position, defendant Iris Mieres Ayuso procured and obtained the declaration of legal incompetency of her husband, Antonio Ayuso Valdivieso, and the Superior Court, Caguas Part, named her as his tutrix, after she testified at said court that Mr. Antonio Ayuso Valdivieso could not work."

At plaintiff's request, the eighth finding of fact above was issued by the court on October 9, 1969, setting forth that Mr. Ayuso Valdivieso "could not work since 1965."

Notwithstanding the nature of these additional findings of fact, the court did not make new conclusions of law, nor did it alter or modify the ones previously made, which we copied above.

In this appeal plaintiff-appellant assigns the commission of the following errors:

### "Assignment of Errors

"1.—The trial court erred in deciding that the letters of June 10 and 19, 1968, where plaintiff raised his complaint and invited defendant to refrain from breaching his contract, as well as setting forth his purpose to bring the matter to court, which is the proper thing to do, constitute an act of insubordination, or one which justified the termination of the contract existing between plaintiff and defendant, Editorial El Imparcial, Inc.

"2.—The trial court erred in concluding that plaintiff's contention on the illegality of the so-called 'Editorial Board,' which by agreement was not going to be established as long as Mr.

Antonio Ayuso Valdivieso's disability prevailed, constituted sufficient grounds for his discharge.

"3.—The trial court erred in concluding that the letters of June 22, 1967, December 3, 1967, March 1, 1968, and May 14, 1968, addressed to plaintiff by the Executive Vice-President of the Editorial El Imparcial, Inc., copies of which are attached to the judgment roll enclosed herein, were inadmissible.

"4.—The trial court erred in refusing the introduction of evidence concerning the reason why defendant sought to cause prejudice to plaintiff, as well as the rebutting evidence which consisted of the testimony of Mr. Guillermo Cintrón Ayuso, setting forth that on July 26, day when defendant claims that a meeting was held at Attorney Félix Ochoteco's office, he had been in Spain for four days.

"5.—The trial court erred in refusing to grant the additional finding of fact requested by plaintiff to the effect that when Littauer went to the first meeting in May 1968, to talk to Mrs. Ayuso, Armando Cosme was present at said meeting, and also, that the interference of defendant Clement Littauer with plaintiff's activities, as well as his charges, took place during the month of May, without said defendant holding any title or position in El Imparcial, this being material evidence to establish the conspiracy between Mrs. Ayuso and Littauer to obstruct and create difficulties for plaintiff and forcing his discharge again.

"6.—The trial court erred in failing to grant plaintiff the due process of law during the trial and in the consideration and decision of his cause."

■ We have carefully considered the vast documentary and oral evidence in the record, and we are convinced that the findings of fact made by the trial court, the first ones, as well as the additional findings, are amply supported by the evidence, except for the legal conclusion which the trial court reached in its original finding of fact No. 13, concerning the letters of June 10 and 19, 1968, addressed by Miranda to Iris Mieres. Since we are dealing with documentary evidence, this Court is in the same position as the trial court in order to determine the legal effect of the same.

Appellant discussed totally those assignments in his brief. We will deal with them in the order they were set forth.

—I—

On June 24, 1968, Iris Mieres, as Secretary of the Editorial El Imparcial, Inc., decided, on her own account, to invalidate the professional services contract between that corporation and appellant, contract which would fall due on July 28, 1973. The only reason which gave rise to such very personal decision, according to her letter of that date, was that Miranda, in his letter of June 19, 1968, stated the following:

"Therefore, since all the acts which I mention·above are illegal and harmful to my rights and duties, I have decided to bring the pertinent judicial action. For that purpose I shall retain the services of Attorney Héctor González Blanes."

She did not consider Miranda's two letters as offensive or disrespectful. The text of those letters should be considered in the·light of everything which happened prior to those letters, which is partly set forth therein, and as for the rest it is revealed in the transcript of evidence.

The trial judge himself, in the second of his original findings of fact—see foregoing p. 585—praised plaintiff, by referring to him as "a well-known writer, whose literary merits have been widely acknowledged in the intellectual circles of Puerto Rico, and whose prestige goes beyond the geographical limits of our island. He is an experienced journalist. During all his long life he has been connected, in one way or other, with journalism."

From the testimony given at the trial by Iris Mieres, on July 22, 1969, which appears at pages 75 and 76 of the transcript of evidence of that day, we took the following:

"ATTORNEY BLANES:

Q. What were your relations with Miranda, while he was at El Imparcial?

A. Very cordial.

Q. Always?

A. Always.

Q. Was there any difference between you?

A. None whatsoever.

Q. How did he behave towards you?

A. As a gentleman.

Q. How?

A. As a gentleman.

Q. That is to say, that Antonio Miranda is a very polite and affable person.

A. Always.

Q. You had no complaint whatsoever against Luis Antonio Miranda?

A. None, absolutely.

Q. Did you intervene in the discharge of Luis Antonio Miranda?

A. Yes sir, in part, I did."

There are two letters, among others which were presented in evidence, sent to Miranda shortly before his discharge, by Attorney Guillermo Cintrón Ayuso, Executive Vice-President of the corporation, and a close relative of Iris Mieres Ayuso's husband, letters which shed the necessary light to properly understand the honest purposes of the two letters plaintiff sent to Iris Mieres. In those letters that vice-president and close relative expressed himself as follows:

"Editorial EL IMPARCIAL
Guillermo Cintrón Ayuso
Executive Vice-President

                    "CONFIDENTIAL

                                        March 1, 1968

"Mr. Luis Antonio Miranda
Assistant Director
Editorial El Imparcial, Inc.
San Juan, P.R.

"Dear Luis Antonio:

"In connection with what we spoke of yesterday and with the conversations which Iris is holding concerning the

sale of the El Imparcial enterprises, for your greater reassurance I want to ratify the following in writing:

"1.—That that sale is not possible unless Antonio is declared legally incompetent, thing which I doubt, since I am afraid that the latter will not last much longer. Besides, it is not convenient for Iris to take that step, since the irregularities of her acts would be disclosed, unless ratified by the court, where you may resort also in order to clarify your rights under your contract, if you want to keep on working and the purchasers do not agree to said conditions.

"2.—That in case said sale is carried out, the El Imparcial enterprises over which I preside are bound to fully compensate you for the discontinuance of the contract. The choice is yours and Iris knows it.

"3.—That any indication or change which, in your opinion, alters this contract or any of its provisions or conditions agreed upon by us, including that which states that your position here is totally independent and that you are not subject to any boss over you, as far as the direction of this newspaper is concerned, entitles you to claim and receive, as agreed compensation, the amount of your monthly wages for the time that remains until the six years are covered.

"4.—That the creation of the Editorial Board with which Iris threatens to breach the contract is impossible, due to Antonio's disability, thing which Ochoteco told you he had told her. We shall not allow her either to continue her intervention with your personnel in order to create difficulties, or to establish boards or committees with them.

"5.—That the enterprise and myself, as well as the members of Antonio's family, who are concerned for his well-being, shall always be grateful for the encouraging results of your devotion, sacrifice, and work, it being my purpose to fulfill my promise to give you an extra bonus for your valuable services and for the increase which the income of the enterprises shall show at the end of the year.

"I think and I hope that your rights are reaffirmed through the reassurance which I provide herein for you in the name of the enterprises and according to the recommendations made by Ochoteco, with whom I have broadly discussed this matter, and

by everything I set forth herein. Go and see him again if she keeps bothering you. He has great esteem and respect for you.

Yours truly,

(Sgd.)    Guillermo Cintrón Ayuso
GUILLERMO CINTRÓN AYUSO
Executive Vice-President"

GCA/gmca.

"CONFIDENTIAL

May 14, 1968

"Mr. Luis Antonio Miranda
Assistant Director
Editorial El Imparcial, Inc.
San Juan, Puerto Rico

"Dear Luis Antonio:

"Through my memorandum of this same date you should already know that I have decided to leave El Imparcial. It is a very sad decision, but Iris' obstinate and illegal intention leaves me no other alternative. I cannot appeal to the court because of family reasons which you know. In taking this step now, you are my greatest, if not my only worry. I know in the pandemonium where I am leaving you. Luis Polo is mediating in Iris' favor and I am sure he will do everything possible in order to prevent litigations. In any event the death of Ochoteco (R.I.P.) has been a greater misfortune for everybody, for Iris respected him since she knew Antonio's reaction if she did otherwise, and besides, he was well acquainted with all the situation. Yet, I do not understand Iris' attitude, unless she is interested, for some reason, to carry us into bankruptcy. Instead of being grateful for our efforts, which have been compensated by the progress of the business transactions, she places more obstacles in our way.

"I have spoken with González Blanes about this matter, and he seems reluctant to intervene because he does not want any kind of trouble with Iris, but I am sure that when the sales operations sought were dealt with, Ochoteco recommended well your affair. Now Iris, without Ochoteco, is not trustworthy.

"It is unnecessary to state the esteem and deep gratefulness which I have for you, although I am leaving without enjoying the success which I so anxiously longed for. I am leaving thus, with the disappointment you may suppose. I spent many years in these tasks. I abandoned my clientele and set aside my profession. I am getting old and it is not so easy to start again with yesterday's spirits. But, let everything be for my affection to Antonio, although, unfortunately, for many years he has not had the mind or spirit to understand us. Now his life is merely vegetative and it is controlled by any one who offers him protection. Iris can irritate him or she can calm him down; she takes him along in order to create false impressions. Everything is very sad; for the sake of Mamita, my nephews, who are his grandchildren, today totally abandoned, and for myself. I hope that the grief of the intrigues which are taking shape do not reach you in the internal form in which they reach us. I would feel very sorry if I contributed to the damage of which you are a victim now also.

"My affection, and I stay as always grateful and sad for the troubles to which you were exposed. Before leaving, I sent a memorandum to the executives, but to you in particular, I wanted to write this letter, telling you of the reasons which give rise to the same.

Truly yours,

(Sgd.)   Guillermo Cintrón Ayuso"

In his fifth additional finding of fact the trial judge said:

"5.—That during plaintiff's first three months in office, Mrs. Ayuso did not intervene with him nor with the former's duties; but after the aforementioned three months she started to intervene with the editors under plaintiff's supervision and with his duties as director, thereby giving rise to plaintiff's protest against such intervention before her, as well as before the Executive Vice-President, Mr. Guillermo Cintrón Ayuso, and the President, Mr. Héctor Cintrón Ayuso."

After being acquainted with all that, it is easy to understand why Miranda, actual and effective director of the newspaper, had to report in vehement and energetic terms the

critical situation created in the editorial enterprise by Iris Mieres Ayuso and other persons at her service.

The violation of the contract of services was not justified in any manner whatsoever. The first error was committed.

—II—

In its third conclusion of law the respondent court concluded that "Luis Antonio Miranda's refusal to acknowledge the authority of the Editorial Board of the newspaper 'El Imparcial' is equal to a breach of contract on his part. His conduct is equivalent to an insubordinate and disobedient attitude towards the rules established in the contract itself, and they justify the termination of the contract by the employer."

In his letter of June 19, 1968, appellant mentions a notice sent by Iris Mieres for a meeting to be held on June 12, 1968. He refers to a "so-called meeting of the never constituted 'Editorial Board of El Imparcial,' " and he says in that letter that "I had decided to go to that meeting in order to challenge its legality for the same reasons which were once set forth by Attorney Félix Ochoteco—and with which you were acquainted. . . ."

However, the respondent court itself, in its subsequent and fourth additional finding, determined:

"4.—That while plaintiff was in office, neither the Board of Directors, nor the Board of Stockholders of the Editorial El Imparcial, Inc., met, nor is there any agreement, according to the minutes of the corporation, establishing the creation of said Editorial Board sought by Iris Mieres Ayuso, the only reference to said Editorial Board being contained in the Letter-Contract of July 26, 1967, to which the court referred in its previous findings."

This conclusive additional finding altered entirely the juridical meaning, value, and effects which could be attributed to the third original conclusion of law challenged in the

second error. According to this additional finding, the Editorial Board, although it was mentioned in the letter-contract, was a juridically nonexistent entity and, with plenty of reason, appellant could have challenged its nonexistence and its absolute incapacity to act in an effective manner. Nobody was empowered to act in its name, until it was created as a law.

In our opinion, through that fourth additional finding the respondent court itself cured the error implied by the original third conclusion of law.

—III—

Plaintiff offered in evidence four letters addressed to him on July 22 and December 3, 1967, and on March 1 and May 14, 1968, by Attorney Guillermo Cintrón Ayuso, Vice-President of the Editorial El Imparcial, Inc., General Manager of the same, nephew of codefendant Iris Mieres' husband, and who had been present when the contract for professional services had been agreed upon orally between that corporation and plaintiff, in Attorney Félix Ochoteco's office in San Juan, on July 21, 1967.

What was agreed upon there and then between both parties was not written down. However, the next day, one of the parties to the agreement, Attorney Guillermo Cintrón Ayuso, wrote the first of those letters where, in addition to making reference to certain situations in the newspaper, he stated the conditions agreed upon by the parties in the contract of professional services executed with plaintiff. That letter had the effect of preserving in writing the terms of the important agreement for the benefit of both parties. The next day its author was leaving for Spain.

In that letter plaintiff was guaranteed that, according to the agreement, he would have "absolute power over the personnel under your supervision and the unconditional direction of the newspaper under the standards and characteristics

which you deem convenient. . . ." He also told him that according to Attorney Ochoteco's opinion, the Editorial Board would have to be created by the Board of Directors and that "I assure you that you will be the only boss in the administration of the newspaper."

Three days later, plaintiff started to work in the administration of the newspaper.

After he accepted in the trial that one of the signatures which appear in the so-called letter-contract of July 26, 1967, was his, Miranda was asked to explain how it was that that document in the form of a letter appeared signed by him and why.

From the transcript of evidence of July 29, 1969, at pages 47–50, we quote the following concerning the explanation he gave:

"Q.—Could you explain to the court what you know in regard to this document and how was it that you signed it, and why?

A.—On July 26, 1967, after I had been working for El Imparcial since the 24th with the contract entered into at the office of Félix Ochoteco, where the Editorial Board was mentioned for the first time, Attorney Antonio Ayuso Valdivieso came to my office accompanied by his wife and by the driver. He had a letter in his hand, the letter was this one, I found out later that it was this one, and they left him alone with me and Antonio gave me the letter. I read it and I noted immediately that the letter brought up the question of the Editorial Board which had been discussed in the office of Félix Ochoteco, and about which Ochoteco stated that such Editorial Board could not be constituted because the Board should be constituted by the Board of Directors, and not by a particular person. That was definitively clarified there . . . . Then, upon reading the letter I noticed that the desire to establish the Editorial Board, of which Iris Mieres Ayuso would be Secretary, was renewed. I thought that it had been definitively agreed upon by Ochoteco and the Vice-President, who had been present during the discussion in the office, that the creation was impossible.

ATTORNEY ORTIZ:

Objection.

WITNESS:

A.—... because of Antonio's disability....

ATTORNEY ORTIZ:

It is opposed to the Editorial Board, there is a provision in the contract itself.

JUDGE:

He wants to explain.

WITNESS:

A.—Then, I noticed that the only thing new which appears in the letter, with the exception of the discussion concerning myself, I did not understand anything which was not about the Board of Directors and the Vice-President.

ATTORNEY ORTIZ:

Objection.

JUDGE:

Yes, but we are on the same thing. That is, that previously a series of conversations had taken place and then it was signed.

WITNESS:

After I became aware of everything new which appeared there and that Ochoteco had convinced me that nobody would interfere with me, I did not think it was improper to sign the letter and I signed it."

On the ground of those circumstances, plaintiff maintained at the trial that the real pacts, conditions, and stipulations, of the contract of professional services were agreed upon on July 21, 1967, in the office of Attorney Ochoteco, and that the same were faithfully reproduced in the letter signed by the Vice-President and General Manager of the corporation, and that the letter-contract, which he signed in good faith a few days after he had started to work, did not represent the authentic common intent of the contracting parties. In order to establish that contention of his, he offered those letters and appellant's oral testimony.

The trial judge rejected them as evidence because he considered that the only contract between the parties was

the one contained in the aforementioned letter-contract and those terms could not be changed under § 25 of the Law of Evidence.

We do not agree with that rejection. In our opinion, under the terms and conditions of the discussion before it, the trial court should have admitted those documents which tended to show what was actually agreed upon between the parties and the contemporaneous or subsequent circumstances under which each one of the agreements in dispute was executed. The real problem of the trier was not only one of interpretation of the letter-contract, but which was the contract of services really agreed upon, whether it was the one executed between plaintiff and all the directors and officers of the corporation on July 21, 1967, in the office of Attorney Ochoteco, or whether it was the contents of the letter which Miranda signed at the request of his old journalist friend, Attorney Antonio Ayuso Valdivieso. All the facts surrounding each alleged contract were necessary to determine the authentic common intent of both contracting parties, since it was a bilateral and onerous contract. In this type of contract the common intent has priority over the unilateral.

■ In the specific situation of the case at bar, § 25 did not authorize the nonadmission of those letters, on the contrary, even though it were a question of only one contract, in § 25 itself it is provided that the same "does not exclude other evidence of the circumstances under which the agreement was made or to which it relates."

Section 28 of the Law of Evidence provides also on that matter:

"For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

■ According to the provisions of § 35, subds. 1 and 13 of the same Act, evidence of the precise fact in dispute and any other facts from which the facts in issue are presumed, or are logically inferable, may be given at trial.

■ On the other hand, our Civil Code, on the interpretation of contracts, provides in its § 1234, that in order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous with and subsequent to the contract.

■ Why not admit in evidence in an action against a corporation, on the grounds of the terms and conditions of a contract, the admissions and statements in regard to the terms of said contract, made willfully and spontaneously in writing, before and after the same, in behalf and in representation of the defendant corporation, by the attorney Vice-President and General Manager of the same, nephew of its President, who personally and together with the other officers discussed and approved the terms and conditions of the contract?

We have analyzed the various continental decisions cited by appellee. There is no similarity whatsoever between the facts involved therein and those of the case at bar.

■ We have repeatedly held that § 25 of the Law of Evidence does not bar extrinsic, oral, or written evidence in all the cases about circumstances which show the existence of certain conditions precedent of the contract, or about the invalidity or uneffectiveness of specific pacts of the contract.[4]

After all, if both parties during the trial accepted that, substantially, the terms and conditions of the contract of services coincided between themselves, just as the same were set forth by the Vice-President, Attorney Cintrón Ayuso, in

---

[4] See: *Rossy* v. *Superior Court*, 80 P.R.R. 705 (1958); *Heirs of Marrero* v. *Santiago*, 74 P.R.R. 763 (1953); *Arias* v. *Torres*, 78 P.R.R. 178 (1955); *Ochoteco* v. *Córdova*, 47 P.R.R. 522 (1934); *Rutledge* v. *Gill*, 78 P.R.R. 665 (1955); *Paracchini* v. *Vilá*, 23 P.R.R. 139 (1915).

his letter of July 22, 1967, and just as they appeared in the letter-contract of the 26th of that month, with the exception that in the former the idea to constitute the Editorial Board had been abandoned, but it was included in the latter, and if from the evidence presented by both parties it came forth, and it was thus determined by the trial court in its additional findings that such Editorial Board never had juridical existence, and from the same evidence it came forth that Antonio Ayuso Valdivieso then and since 1965 was or could only be a symbolic director of the newspaper El Imparcial, and that Miranda was the authentic and real director since July 22, 1967, until the day when his contract was unilaterally nullified, as a practical matter, both agreements were equally binding upon both parties and they had nothing conflicting in themselves. Things or services which are impossible, pursuant to § 1224 of our Civil Code, cannot be the object of a contract.

—IV, V and VI—

Because we consider that the second cause of action in this case in particular does not lie, we shall not discuss assignments IV and V. In regard to assignment VI, because of the general terms in which it is stated, we shall not discuss it either.

Appellant always duly fulfilled the obligations which the contract of services imposed upon him. It was obviously established in the trial that plaintiff, Luis Antonio Miranda, has always been a chivalrous and affable person of refined humane condition; for many years he has devoted himself, with great distinction, to journalism, in almost all of its aspects; he is a writer of great ingenuity and elegance, a vigorous intellectual of deep culture, whose literary merits, in the words of the respondent court itself: "have been widely acknowledged in the intellectual circles of Puerto

Rico, and whose prestige goes beyond the geographical limits of our island."

Since July 24, 1967, when he started to work as actual director of the newspaper El Imparcial—because of health reasons of the symbolic director Antonio Ayuso Valdivieso—[5] until June 25, 1968, when by fiat of Iris Mieres, she nullified and violated his contract of services, leaving him out of the director's position, he improved greatly the quality of the newspaper, notably increased the benefit of the enterprise, its circulation, and the demand of space for commercial and industrial advertisement.

He described his work in the newspaper in the following terms:

"A. My work was in El Imparcial, it was a work which started by being a work of reorganization. Formerly, the editorial staff was in a terrible situation of crisis and I had to start organizing the structure of the newspaper, the structure of the editorial staff as well as of the newspaper. I can do, if Your Honor allows it, a short report as to how it operated.

.        .        .        .        .        .        .        .

"Newspapers have an editorial staff, that is, the workshop where the newspaper is prepared. At that workshop there arrives all the information of the street reporters, of the reporters who work in the editorial office, of another person who receives through teletype from the island and international teletype, there goes the material which has been assigned to the photographer in certain assignments, the collaborations of persons who send articles voluntarily, there also arrive the collaborations of the persons who have been asked to collaborate, and the collaborations bought from the syndicates, and the final sections for the newspaper, a variety of sections. Then, all that

---

[5] In his testimony, to questions from his counsel as to who performed the work of the direction of the newspaper as director, plaintiff asserted: "I did the work of the director. Antonio could not do that work." (Tr. Ev. 61, session of July 29, 1969.) The same thing was testified by Iris Mieres, although she made it clear that he acted as director in her husband's absence. But it seems that this absence since 1965 was almost permanent, for after that year he only went out to take a walk.

material which composes the newspaper edition, requires an assistant for the director, who is called 'Editor in Chief.' I particularly named Santiago Gálvez Maturana to that position, whom I can say was of great assistance to me and he dealt with the informations, and when there was any controversial information he had to submit it to me because the final approval for publication was mine. I dealt personally with all the big collaborations, the column, articles of the syndicates, the articles which come to the newspaper voluntarily, the articles asked from specific writers, and I dictated the editorial. I offered the views which I considered to be more constructive, so that the newspaper would have the best possible quality, and my work was one of absolute devotion to the newspaper. I want to establish that in the eleven months during which I worked in the newspaper, I was never absent from my work. I arrived at the newspaper at the time when my editorial responsibility started and I did not leave the newspaper until I closed the edition, at seven, eight, eleven, and sometimes at twelve o'clock midnight, when we were waiting for local or international information in order to say which was going to be on the front page. I never enjoyed one day of vacation leave. I was at the newspaper every single day of the eleven months, except on New Year's Day, when there was no kind of work."

Notwithstanding the great amount of work, his invariable and constant devotion to the service of the editorial enterprise, since October 1967, Iris Mieres and codefendant Littauer did not observe towards him the best and most adequate behavior.

According to the contract of services actually and juridically executed with the common understanding of the parties —which we consider was that of July 21, 1967, orally agreed to in the office of Attorney Ochoteco and summarized on the following day in the letter of Attorney Guillermo Cintrón Ayuso—[6] the codefendant enterprise, pursuant to the provisions of §§ 1054 and 1057 of our Civil Code and the doctrine established in *Villar & Co., Inc.* v. *Conde,* 37 P.R.R. 658 (1928), should pay plaintiff all the monthly salaries com-

---

[6] And according, also, to the aforementioned letter-contract.

prised between August 1, 1968 and July 31, 1973, at the monthly rate of $1,300 and also the legal interest accrued for the amount of each monthly salary, from the time it should have been paid until it is totally satisfied.

The Editorial El Imparcial, Inc., is ordered to pay $8,000 for attorney's fees for plaintiff, plus the costs before the trial court, including those incurred in the instant petition for review.

Judgment will be rendered reversing the judgment appealed from and sustaining the complaint only as to its first cause of action against the Editorial El Imparcial, Inc., in accordance with the foregoing.

Mr. Justice Hernández Matos and Mr. Justice Santana Becerra, writer of the opinion, believe that the second cause of action should have prospered also.

Mr. Acting Chief Justice Pérez Pimentel, Mr. Justice Rigau, and Mr. Justice Martínez Muñoz did not participate herein.